IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ADVANCED AMBULATORY SURIGAL
CENTER, INC., an Illinois
Corporation,

               Plaintiff,

         v.

CONNECTICUT GENERAL LIFE
INSURANCE CO., a Delaware
Corporation,

              Defendant.

Case No.  13 C 7227

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion for Partial Summary Judgment [ECF No. 89].  For the reasons stated below, the Court grants Defendant's Motion.

## I.  BACKGROUND

### A.  Factual Background

The following facts are undisputed unless noted otherwise. Plaintiff Advanced Ambulatory Surgical Center, Inc. ("AASC") is a state-licensed outpatient surgery center located in Chicago, Illinois.  (ECF No. 101 ("Pl.'s SAUF") ¶ 1 & Ex. 1 ¶ 3.)  When a surgeon wants to perform a procedure at AASC, she submits paperwork, including a photocopy of the patient's health insurance card.  (ECF No. 90 ("Def.'s SUF") ¶¶ 30-31.)  Before

it renders any services, AASC seeks to verify the patient's insurance coverage with respect to the planned procedure by calling the company who issued the patient's insurance policy or, as the case may be, administers the policy's benefits. (Pl.'s SAUF ¶ 2.) Indeed, AASC rarely treats patients who lack insurance. (Campos Tr. 14:5-15; Rubio Tr. 21:13-23.) During these calls, AASC employees obtain the patient's basic benefits information and record it on a one-page insurance verification form. (Def.'s SUF ¶ 31; Pl.'s SAUF ¶ 3; *see, id.* at Ex. 1.) AASC treats patients insured under health benefit plans administered by Defendant Connecticut General Life Insurance Company, Inc. ("Cigna"), although it is an out-of-network provider with respect to Cigna plans. (Def.'s SUF ¶ 1.)

Cigna provides claims administration and insurance services for health benefit plans that employers offer. Under Cigna plans, covered individuals have the option to receive medical care from in-network providers, who have contracted with Cigna to accept a negotiated schedule of fees for medical services, and out-of-network providers, who formulate their own menu of services and fees. (Def.'s SUF ¶¶ 5-6.) To be eligible for benefits, a Cigna plan member typically must pay a portion of the covered health care expenses either in the form of coinsurance (a fixed percentage of the covered charges), a copay

(a flat per-service fee), or a deductible (the total dollar amount of covered expenses that the member must pay during the calendar year before the plan's benefits kick in). (*Id.* ¶¶ 7, 9.)

To nudge policyholders toward in-network providers, most insurance companies impose higher patient contribution requirements (known as "cost shares") with respect to services rendered by out-of-network providers. Seeking a competitive advantage, some out-of-network providers disregard these required patient contributions and instead engage in "fee forgiveness" – billing patients nothing and simply accepting reimbursement under a plan as payment in full. (Def.'s SUF ¶ 10.) This practice actually reverses the intended incentives, as patients who receive treatment from out-of-network fee forgivers actually pay less out-of-pocket than they otherwise would for the same in-network health care services. To discourage fee forgiveness, many benefit plans, such as those administered by Cigna, refuse to cover "charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan." (*Id.* ¶ 11.) In addition, Cigna tries to parry the lunge of fee forgiveness by limiting coverage to "covered expenses," defined as expenses actually incurred by the

patient after he or she becomes insured under a given plan. (*Id.* ¶ 12.)

Since 2005, Cigna has precipitated all benefits verification calls with a disclaimer. Until February 2013, Cigna's disclaimer went:

> The following information does not guarantee coverage or payment. The governing document for a patient's coverage is their Summary Plan Description. Payment for services will be based on medical necessity, plan provisions, and eligibility at the time of service.

(Def.'s SUF ¶ 25.) Cigna slightly altered the wording of the disclaimer in February 2013, and since then it has announced:

> By continuing with this call, you understand, accept, and agree that the following covered services information does not guarantee coverage or payment and is subject to all benefit plan provisions. Please refer to the Summary Plan Description for coverage. Payment for services will be based on medical necessity, plan provisions, including limitations and exclusions, and eligibility at the time of service.

(*Id.* ¶ 26.) Both disclaimers ran before the inquiring provider could access Cigna's automated benefits system or speak to a live support representative. (*Id.* ¶ 27.)

During the time period at issue, two AASC employees called Cigna to verify patient benefits prior to a scheduled procedure: Yuri Campos ("Campos") and Kathy Rubio ("Rubio"). Campos acknowledged that, whenever she called Cigna, she heard a disclaimer warning that payment on any particular claim was not

- 4 -

guaranteed; Rubio could not recall the content of the disclaimer at her deposition but did not deny hearing it whenever she called Cigna. (*Id.* ¶ 38.)  Both remained on the line long enough to speak with a live Cigna agent who could verify the patient's insurance information.  Joanna Brzostowska ("Brzostowska"), who oversees the company's billing and collection processes, did not supervise Campos or Rubio while they were making these calls and thus never heard what Cigna's agents said in response to their questions.  (Pl.'s SAUF at Ex. 1 ¶¶ 1-2; Brzostowska Tr. 26:22-27:9.)

After identifying various personal information of the patient, Campos or Rubio recorded what the Cigna agent told them about the patient's out-of-network plan benefits on the patient's insurance verification form, including the patient's deductible, amount of deductible met, "Coverage (%)," maximum out-of-pocket amount, amount of the maximum met, and annual maximum for outpatient surgery (if applicable). (Def.'s SUF ¶ 31; Pl.'s SUF at Ex. 1.)  In addition, they would sometimes indicate on the form whether the insurer's reimbursement was based on "Usual & Customary" rates or Medicare rates and whether the plan was employer-sponsored. (*Ibid.*)  Finally, they would fill in a portion of the form indicating exclusions or

restrictions on the policy, either for surgical procedures or specific body parts or specialties. (*Ibid.*)

On these calls, Cigna's representatives made no promises or guarantees of payment, and neither Campos nor Rubio were led to believe that AASC was certain to receive any specific reimbursement for the surgical services it would ultimately render. (Def.'s SUF ¶¶ 32-33; *see also,* Brzostowska Tr. 265:7-18 (denying "aware[ness] of any insurance verification call in which a Cigna customer service representative promised or agreed to pay all or part of the billed charges").) Neither provided Cigna with estimates or exact amounts of billed charges, because when they placed these calls AASC did not know what its billed charges would be. (*Ibid.*) Neither Campos nor Rubio asked Cigna for reimbursement estimates, because Cigna would not release that information. (*Id.* ¶ 34.) Campos and Rubio testified to their general understanding that the benefits information Cigna verified, such as the percentage they recorded on the verification forms in the "Coverage (%)" field, conveyed to them that the patients' procedures would be covered at those levels. (*Id.* ¶ 39.) Campos believed that this percentage referred to the allowed amount; Rubio understood it to apply either to the usual and customary amount determined by the insurance company or a Medicare-based amount; and Brzostowska generally testified

that Cigna wrongfully failed to pay a certain percentage of AASC's billed charges. (*Id.* ¶¶ 28, 39.) None of the three could recall a conversation in which a Cigna representative promised or agreed to pay all or part of AASC's allowed, billed, usual and customary, or Medicare-based charges. (*Id.* ¶¶ 28, 36-37.)

After Cigna verified the percentage at which the patient's plan covered AASC's out-of-network procedure, AASC would typically schedule the patient for surgery. On the day of surgery, the patient assigned her health insurance benefits to AASC. (Def.'s SUF ¶¶ 40-41.) After the surgery, Brzostowska would prepare an insurance claim and submit it on behalf of AASC to Cigna. (*See, e.g.,* Campos Tr. 36:12-38:12.)

On October 7, 2010, Allyson Day ("Day") of Cigna's Special Investigations Unit initiated an investigation into whether AASC was engaging in fee forgiveness. (Def.'s SUF ¶ 12.) (Details of that investigation are largely irrelevant to resolution of Cigna's Motion.) On October 21, 2010, Day sent AASC a letter seeking information regarding "your policy on the collection of patient co-pay and/or coinsurance" and asking whether AASC collected "payment on the member's full out of network responsibility." (*Id.* ¶ 14.) Hearing no response from AASC, Cigna eventually implemented a fee-forgiveness protocol effective December 21, 2010, under which Cigna operated on the

assumption that AASC was forgiving its patients' out-of-network cost shares, thus triggering the exclusion in Cigna plans for expenses that a plan member is not obligated to pay personally. (*Id.* ¶ 15.) Day memorialized all this in a December 21, 2010 letter to Brzostowska. (*Ibid.*) The letter recited the following example of the new protocol: upon receiving an AASC claim for $15,000 for which AASC charged the patient $0, Cigna would reimburse AASC $0. (*Id.* ¶ 16.) Day's letter concluded by noting that AASC's claims would continue to be denied on fee-forgiveness grounds until it submitted clear evidence that the charges shown on the claims "are the actual charges for the services rendered" and that Cigna plan member "is required to pay the full applicable out-of-network co-insurance and/or deductible." (*Ibid.*)

Brzostowska denies contemporaneously receiving Day's letter. Instead, she claims to have received it as an attachment to Cigna's correspondence with the Illinois Department of Insurance ("DOI"), which was forwarded to AASC in response to complaints AASC filed against Cigna in 2011 over non-payment of claims. (Def.'s SUF ¶¶ 15-19.) (In response to AASC's Complaint, Cigna personnel had sent the DOI letters asserting that, because of AASC's fee-forgiving practices, the standard exclusion in Cigna's plans for charges a member is not

obligated to pay barred coverage for AASC's claims. (*Id.* ¶ 20.))

Both Brzostowska and AASC's CEO, Sverko Hrywnak ("Hrywnak"),

testified that AASC had notice of Day's letter by October 4,

2011, when outside counsel for AASC sent Day a demand letter

denying that AASC was engaged in fee forgiveness. (*Id.* ¶¶ 22-

23.) Day responded to counsel's letter, reiterating that no

payments were due AASC under the plans because its practice of

waiving patient cost shares triggered the standard exclusion for

charges a plan member is not personally obligated to pay. (*Id.*

¶ 24.)

For its part, AASC denies that it ever engaged in fee

forgiveness as a general practice, instead claiming that it

attempted to collect the out-of-network cost shares listed on

the explanation of benefits it received for each Cigna patient.

(Pl.'s SAUF ¶¶ 6-7.) When an indigent patient was unable to

pay, AASC would grant "a case-by-case charity write off" of

their cost shares. (ECF No. 100 ("Pl.'s Mem.") at 2.) Even

after October 4, 2011, the *status quo* largely persisted.

Despite Cigna's fee forgiveness protocol, Campos and Rubio

continued placing verification calls to Cigna before AASC

rendered services and filling in patient verification forms with

the benefits information the Cigna representative provided.

AASC continued to bill Cigna as before and write off out-of-

network cost shares (whether on a one-off charity basis or as a matter of course); Cigna would sometimes pay or have its agents negotiate the resulting claims. (Pl.'s SAUF ¶ 10.)

The insurance policies assigned to AASC and at issue in this case fall into two camps: those that Cigna issued, and those that it did not issue but for which it serves as claim administrator. (*See,* Def.'s SUF ¶¶ 42-43.) Two entities issued those policies that Cigna did not: the State of Illinois and the Metropolitan Pier and Exposition Authority. (*Ibid.*) Cigna does not insure the State's policies, which are instead self-insured health plans. (*Id.* ¶ 43 (noting that the State's benefits handbook informs employees of "the State's self-insured health plan").) The same is the case for the Metropolitan Pier and Exposition Authority. (*Id.* at Ex. 15 ("THIS DOCUMENT MAY USE WORDS THAT DESCRIBE A PLAN INSURED BY CONNECTICUT GENERAL. BECAUSE THE PLAN IS NOT INSURED BY CONNECTICUT GENERAL, ALL REFERENCES TO INSURANCE SHALL BE READ TO INDICATE THAT THE PLAN IS SELF-INSURED.").)

### B. Procedural Background

AASC initiated this lawsuit on September 5, 2013 in the Circuit Court of Cook County, seeking reimbursement for each of the outstanding claims Cigna refuses to pay. Cigna removed the case to this Court on grounds that (1) AASC's claims are

preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), and (2) there is diversity under 28 U.S.C. § 1332.

Since then, AASC has twice amended its Complaint and brings, in addition to its federal ERISA claim, counts of promissory estoppel and fraud as well as a count based on 215 Ill. Comp. Stat. 5/155 for vexatious and unreasonable delay in settling insurance claims. AASC's promissory estoppel and fraud claims cast Cigna representatives' statements to Campos and Rubio as actionable promises, on which AASC reasonably relied, that Cigna would pay a certain percentage of its charges incurred in providing services to plan members. Cigna now moves for partial summary judgment on AASC's state-law claims.

## II. <u>LEGAL STANDARD</u>

On summary judgment, this Court draws all facts and inferences from them in favor of the non-moving party. *See, e.g., Laskin v. Siegel,* 728 F.3d 731, 734 (7th Cir. 2013). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See, Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "To survive summary judgment, the non-moving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Life Plans, Inc. v. Security Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015).

## III. <u>DISCUSSION</u>

Cigna moves for partial summary judgment on AASC's state-law claims, arguing that there exists no genuine dispute of material fact precluding judgment in its favor on AASC's promissory estoppel and fraud claims. More specifically, Cigna claims that undisputed evidence establishes the lack of any unambiguous promise or actionable fraudulent statement to Campos or Rubio and, in any event, that any reliance by AASC was unreasonable. Cigna further contends that relief under the Illinois Insurance Code, 215 Ill. Comp. Stat. 5/155, fails as a matter of law because AASC's claims under the statute are either preempted by ERISA or concern benefit plans for which Cigna is not an "insurer" within the meaning of the statute.

## A. Promissory Estoppel

The parties agree that AASC's promissory estoppel and fraud claims are governed by Illinois law. To survive Cigna's Motion for Summary Judgment, AASC must present evidence from which a trier of fact could find that (1) Cigna made "an unambiguous promise," (2) AASC "relied on such promise," (3) AASC's "reliance was expected and foreseeable" by Cigna, and (4) AASC "relied on the promise to its detriment." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.,* 906 N.E.2d 520, 523-24 (Ill. 2009) (citation omitted).

Cigna attacks the first and third elements of AASC's promissory estoppel claim, arguing that (1) it never made an "unambiguous promise" on benefits verification phone calls with Campos and Rubio to pay a specific percentage of AASC's charges and (2) even if it did, AASC's reliance on any such promise was unreasonable in light of both the pre-recorded disclaimer that played before they spoke with a live Cigna agent and the absurdity of assuming that Cigna would agree sight unseen to pay a fixed percentage of any and all charges AASC incurred. Cigna also argues that AASC is barred from asserting a promissory estoppel claim because it received an assignment of ERISA plan benefits from its patients. The Court does not reach Cigna's unreasonable reliance and assignment arguments, because it is

undisputed that its agents made no unambiguous promise of payment to AASC.

First, all the evidence indicates that Cigna agents did not explicitly promise or agree to reimburse AASC. Such agreement between the parties that there was no explicit promise distinguishes this case from *Connecticut General Life Ins. Co. v. Grand Avenue Surgical Center, Ltd.,* 181 F.Supp.3d 538 (N.D. Ill. 2015), in which the court denied summary judgment on the unambiguous promise issue based on testimony that Cigna "responded to these inquiries by *promising* to cover a specific percentage of [the plaintiff's] billed charges." *Id.* at 544-45 (emphasis added) ("[A] reasonable trier of fact could credit Jafari's testimony and conclude that [Cigna] promised to pay [the plaintiff']s billed charges at a specific percentage."). AASC has adduced no such evidence in this case.

Rather, the salient question here is whether a Cigna agent, purely by *verifying* the plan benefits of an AASC patient, made an unambiguous promise to reimburse AASC at the stated percentage of its charges. AASC is correct that Illinois law does not require an *express* promise - only an unambiguous promise - to create a triable issue of fact on a promissory estoppel claim. *See, Bank Comp. Network Corp. v. Continental Illinois Nat'l Bank & Trust Co.,* 442 N.E.2d 586, 590-91 (Ill.

App. 1982) ("[T]he promise essential to a claim of promissory estoppel need not be express, only unambiguous."), *cited with approval, Goldstick v. ICM Realty,* 788 F.2d 456, 462-63 (7th Cir. 1986). On the other hand, the evidence furnishes no support for finding a "distinct intention common to both [parties]" such as would transform Cigna's mere verification of a patient's benefits into a promise to pay for services. *See, e.g., DAC Surgical Partners P.A. v. United Healthcare Servs., Inc.,* No. 4:11 C 1355, 2016 WL 7157522, at *4 (S.D. Tex. Dec. 7, 2016) ("[E]ven assuming that it was [the provider's] practice to make verification calls, the calls were actually made, and the insurance was verified, that verification was not the same as a promise of payment (see above). United's alleged promises of payment (not their verifications of coverage) are the crux of this case."); *Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc.,* 520 F.Supp.2d 1184, 1193-94 (C.D. Cal. 2007) (finding that health insurer did not manifest intent to pay for health provider's services merely by verifying insured's coverage status for medical provider); *Cedars Sinai Med. Ctr. v. Mid-West Nat'l Life Ins. Co.,* 118 F.Supp.2d 1002, 1008 (C.D. Cal. 2000) (rejecting hospital's contention that "verification of coverage was a promise" to pay for patient's "covered treatment";

"[W]ithin the medical insurance industry, an insurer's verification is not the same as a promise to pay.").

An Illinois state court case is on all fours with this one. In *Centro Medico Panamericano, Ltd. v. Laborers' Welfare Fund,* 33 N.E.3d 691 (Ill. App. 2015), the court upheld the trial court's grant of summary judgment to the defendant insurer on an out-of-network provider's promissory estoppel claim. As in this case, the plaintiff there placed pre-procedure calls to the insurer to verify the patient's coverage. *Id.* at 692-93. According to the plaintiff's insurance verification forms summarizing these calls, the insurer's representative confirmed coverage, disclosed the patient's required cost shares, and provided the benefit levels and percentages stated in the patient's plan. *Id.* at 693-94. Because the plaintiff offered no evidence that the insurer made an oral promise of reimbursement or indeed did anything more than confirm coverage as indicated on the forms, summary judgment to the defendant on the plaintiff's promissory estoppel claim was proper. *Id.* at 694-95. (In a different suit brought by the same provider, the court similarly held that a third-party insurance administrator did not, by merely informing the plaintiff that coverage would be 60 percent, make an unambiguous promise to pay that percentage of the provider's billed charges. *See, Centro Medico Panamericano,*

*Ltd. v. Benefits Mgmt. Grp., Inc.,* 61 N.E.3d 160 (Ill. App. 2016).)

To the extent *Laborers' Welfare Fund* conflicts with *Chatham Surgicore, Ltd. v. Health Care Serv. Corp.,* 826 N.E.2d 970, 976 (Ill. App. 2005) (finding that podiatric facility stated a claim for promissory estoppel by alleging that insurer promised to pay charges when it verified coverage), the latter case is not dispositive. *Chatham,* unlike *Laborers' Welfare,* was not decided at summary judgment but instead at the motion-to-dismiss stage. What is more, the case here for summary judgment is stronger than it was even in *Laborers' Welfare Fund,* as the insurer there could not point to a disclaimer of the sort that Cigna employed here before its agents spoke with Campos or Rubio. Although the Court need not reach the disclaimer's import on the reasonableness of AASC's reliance, its ubiquity is probative of whether the parties shared a common intention that Cigna, by verifying benefits, was promising to pay.

Federal cases are also in accord. In *Ambulatory Infusion Therapy Specialists, Inc. v. UniCare Life and Health Ins. Co.,* Civ. No. H-06-1857, 2007 WL 1520994 (S.D. Tex. May 22, 2007), for example, an ambulatory center's president called an insurer to pre-verify a patient's coverage and subsequently received a faxed document describing the patient's out-of-network benefit

levels. *Id.* at *1. Based on the phone call, the provider claimed a general understanding that it would receive 75 percent of its claim for the procedure but also admitted that the verification ultimately depended on policy terms she had not seen or requested. *Id.* at *2-3. The court granted summary judgment to the insurer on the provider's promissory estoppel claim, because the provider failed to adduce evidence that the insurer promised during the pre-verification call to pay 75 percent of the provider's claim. *Id.* at *3.

The Court does not doubt the sincerity of AASC's refrain that these calls are indispensable to its practice and that AASC would have declined to go forward with a patient's surgery if Cigna had *not* confirmed the availability of benefits (or had specified only a *de minimis* reimbursement percentage). However, AASC is asking that fact to prove too much; confirming the availability and details of a patient's insurance benefits is not a concomitant promise of payment. Indeed, if every time an insurer's agent verifies coverage to a provider she binds the insurer to payment of a subsequent associated claim on the exact same terms, insurers would doubtless cease offering this valuable service to providers. In turn, this would engender even greater uncertainty in our already fraught health care system; without a ready means of verifying a patient's coverage,

providers might end up losing vast sums of money by treating uninsured or underinsured patients – not to mention the expense in time of preparing and submitting doomed claims.  AASC would seem particularly hard-hit in this scenario, as it rarely (if ever) opts to treat patients who lack insurance.

For all the above reasons, Cigna's Motion for Partial Summary Judgment is granted as to AASC's promissory estoppel claim.

## B.  Fraud

Establishing actionable fraud under Illinois law requires a showing that Cigna "(i) made a false statement of material fact; (ii) knew or believed the statement to be false; (iii) intended to and, in fact, did induce the plaintiff to reasonably rely and act on the statement; and (iv) caused injury to the plaintiff." *Reger Dev., LLC v. National City Bank,* 592 F.3d 759, 766 (7th Cir. 2010) (citing *Redarowicz v. Ohlendorf,* 441 N.E.2d 324, 331 (Ill. 1982)); *accord, Connick v. Suzuki Motor Co., Ltd.,* 675 N.E.2d 584, 591 (Ill. 1996).  Because AASC does not claim that Cigna's statements about a plan member's benefits were themselves false or fraudulent, but instead that they implied a promise of future conduct, AASC's fraud count is thus one for promissory fraud.  As such, AASC must also meet the additional requirement of showing a "scheme to defraud."  *Association Ben.*

*Servs., Inc. v. Caremark RX, Inc.,* 493 F.3d 841, 853 (7th Cir. 2009).

For AASC to survive summary judgment, there must at least be a factual dispute as to whether "when the promise was made, the promisor had no intent to fulfill it." *Ass'n Ben., supra,* 493 F.3d at 853.  But AASC does not have any evidence, as explored above, that Cigna agents made statements that were understood as a guarantee or promise regarding future conduct. Rather, everyone agrees that the information conveyed on the calls was limited to *accurate* representations of *existing* fact – namely, what insurance benefits a particular patient's plan provided.  Statements summarizing a patient's insurance benefits on pre-verification calls as a matter of law fall short of a promise to pay.  *See, e.g., DAC Surgical,* 2016 WL 7157522, at *4; *Laborers' Welfare Fund,* 33 N.E.3d at 694-95; *Tenet Healthsystem,* 520 F.Supp.2d at 1193-94; *Cedars Sinai,* 118 F.Supp.2d at 1008; *Laborers' Welfare Fund,* 33 N.E.3d at 694-695. Other than testimony consistent with the facts of those cases – for example, that AASC's decision to proceed with a patient's surgery depended on getting a verification of benefits - AASC has adduced no evidence that these statements of existing fact somehow conveyed to listeners a promise of future conduct (*i.e.,* reimbursement).  As such, there is no actionable fraud.

At the motion to dismiss stage, the Court credited AASC's allegations "that Cigna, on multiple occasions, misrepresented that it would reimburse AASC for its services, despite having no intention of ever making good on its promise." *Advanced Ambulatory Surgical Ctr., Inc. v. Cigna Healthcare of Illinois,* No. 13 C 7227, 2014 WL 4914299, at *4 (N.D. Ill. Sept. 30, 2014). While these allegations satisfied the promissory fraud pleading requirements, discovery has shown that neither Campos nor Rubio heard anything resembling a promise or even leading them to believe that reimbursement would be guaranteed. Instead, the factual allegations in AASC's Complaint appear supported only by a general understanding on the part of Campos and Rubio – as well as Brzostowska and Hrywnak, who lack personal knowledge of the calls – that the context of Cigna's statements suggested a commitment to pay. To the extent it is not a legal argument masquerading as a factual issue, this equation of benefits verification with a promise to pay is divorced from the express, undisputed contents of Cigna's statements and is contradicted by every other bit of Campos's and Rubio's testimony – to say nothing of Cigna's own evidence. It does not suffice to create a triable issue as to whether Cigna is liable for promissory fraud.

As with its promissory estoppel claim, AASC has adduced no evidence in support of its promissory fraud claim that creates a triable issue on whether the Cigna agents who verified a patient's health insurance benefits promised associated future payment. The Court is thus compelled to grant summary judgment to Cigna on AASC's promissory fraud count.

## C. Illinois Insurance Code Claim

AASC's final state-law claim invokes the Illinois statute that permits a court to tax attorneys' fees and other costs in an action "by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder." 215 Ill. Comp. Stat. 5/155. Illinois law limits liability under Section 155 to insurers; it does not allow recovery against non-insurers. *See, e.g., Cramer v. Ins. Exch. Agency,* 675 N.E.2d 897, 899 (Ill. 1996) (concluding that the statute was designed to punish insurers); *Cummings Foods, Inc. v. Great Central Ins. Co.,* 439 N.E.2d 37, 44 (Ill. App. 1982) (affirming dismissal of plaintiff's claim "requesting punitive damages against . . . noninsurers" because "[t]he evident purpose of section 155 was to provide an insured with the remedy against an insurer under circumstances where the issue is the amount of loss, or the liability of the insurer on a policy of insurance"); *see*

*also, Savino Del Bene, U.S.A., Inc. v. Hartford Fin. Servs. Grp., Inc.,* No. 11 C 6103, 2012 WL 3961224, at *1 (N.D. Ill. Sept. 7, 2012) ("Illinois law is clear that liability under Section 155 is limited specifically to insurers.") (citation omitted). The Illinois Insurance Code defines "insurance company" to "include a corporation, company, partnership, association, society, order, individual or aggregation of individuals engaging in or proposing or attempting to engage in any kind of insurance or surety business, including the exchanging of reciprocal or inter-insurance contracts between individuals, partnerships and corporations." 215 Ill. Comp. Stat. 5/2. Section 155 provides recourse to assignees that succeed to the same position of the insured. *See, e.g., LoStatewide Ins. Co. v. Houston Gen. Ins. Co.,* 920 N.E.2d 611, 625 (Ill. App. 2009); *Garcia v. Lovellette,* 639 N.E.2d 935, 937 (Ill. App. 1994).

As an initial matter, AASC's § 155 claim is preempted insofar as it relates to services provided to patients with ERISA-governed health plans. *See, Advanced,* 2014 WL 4914299, at *3 (also collecting cases). The question is trickier with respect to non-ERISA patients – that is, those whose plans are governed by state law. AASC does not dispute that the only governmental plans at issue in this case are those maintained by

- 23 -

the State of Illinois and the Metropolitan Pier and Exposition
Authority. Cigna argues for summary judgment on the basis that
it is merely the third-party administrator for these state-
funded policies, not an "insurer" under Section 155. Although
it failed to furnish the relevant authority, Cigna is correct.

There is something of a fine line here. The acts of an
insurer's agent – such as an appraiser or third-party
administrator - may constitute unreasonable and vexatious
conduct under Section 155 for purposes of an insured's action
*against the insurer*. *See, e.g., McGee v. State Farm Fire and
Cas. Co.,* 734 N.E.2d 144, 155 (Ill. App. 2000) ("An appraiser's
failure to agree to the selection of an umpire may constitute
unreasonable and vexatious conduct and may be attributed to an
insurance company when the appraiser acts as the insurer's
agent."); *Green v. Int'l Ins. Co.,* 605 N.E.2d 1125, 1129-30
(Ill. App. 1992) (denying summary judgment to insurer based on a
material issue of fact as to whether an appraiser unreasonably
delayed as insurer's agent and at its behest). The problem for
AASC, however, is that its actionable (*i.e.,* non-preempted)
Section 155 claims derive from self-funded policies issued by
state entities that are not parties to this suit. AASC is not
seeking to attribute Cigna's conduct as an agent to the policy

issuers in a suit against them, but is instead proceeding against the noninsurer itself.

Because Cigna does not insure the policies of the patients at issue (of whose claims AASC is assignee), it is not an "insurer" within the meaning of Section 155. Other courts have similarly declined to extend Section 155 liability beyond the issuer of the insurance policy. *See, e.g., Cuneo, Gilbert & LaDuca, LLP v. Carolina Cas. Ins., Co.,* No. 14 C 4061, 2016 WL 8711487, at *3 (N.D. Ill. July 22, 2016) (granting motion to dismiss as to third-party claims examiner that participated in denial of coverage to insured plaintiff). The same conclusion reached in *Cuneo* obtains here: the State of Illinois and the Metropolitan Pier and Exposition Authority, not Cigna, are the "insurers" of the only non-ERISA policies in this case.

Doubtless AASC will protest that the Court previously denied Cigna's Motion to Dismiss the state-law claims on these grounds. *See, Advanced,* 2014 WL 4914299 at *5 ("[T]he Court fails to see how [Cigna's contention that several of the policies at issue were funded by insurers other than Cigna] serves as a basis for dismissal, since Cigna admits that it issued at least some of the policies involved in this case."). However, that was because discovery had not revealed what it has now: that the only non-ERISA plans at issue in this case are

self-funded plans issued by municipal entities, plans for which Cigna acts only as third-party administrator.

As such, summary judgment is granted to Cigna on Count III of AASC's Complaint.

## IV.  CONCLUSION

For the reasons stated herein, Defendant's Motion for Partial Summary Judgment [ECF No. 89] is granted.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: June 13, 2017